**SMURFIT DIAMOND PACKAGING CORP., Petitioner,**

v.

**SECRETARY OF LABOR, et al., Respondents.**

No. 85–3027.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 16, 1986.

Decided Feb. 21, 1986.

---

Robert A. Dimling, argued, Cincinnati, Ohio, for petitioner.

Elizabeth S. Woodruff, Solicitor's Office, Washington, D.C., Sandra Lord, argued, for respondents.

Before NATHANIEL R. JONES and DAVID A. NELSON, Circuit Judges; and JOHN W. PECK, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

Smurfit Diamond Packaging Corporation, which operates a paper mill in Middletown, Ohio, has filed a petition under 29 U.S.C. § 660(a) asking us to set aside portions of an order of the Occupational Safety & Health Review Commission that had the effect of affirming an Administrative Law Judge's decision to penalize Smurfit $150.00 for poor housekeeping. We shall grant the petition and set aside the portions of the order complained of.

**I**

One of the machines in Smurfit's paper mill forms pulp into a continuous sheet of wet paper that is then calendered and coated. The processes used in the operation of the paper machine are "wet processes" within the meaning of the "General Requirements" section of the Occupational Safety & Health Administration ("OSHA") regulations, 29 C.F.R. § 1910.22(a)(2).

Since December of 1980 Smurfit's Middletown mill has been run under the direction of a plant manager named Lon D. Lewis. Mr. Lewis holds Bachelor of Science and Master of Science degrees in me-chanical engineering and industrial engineering from respected educational institutions. Except for two years of service as an officer in the Army Artillery Corps, he has spent his entire career—amounting, thus far, to more than a dozen years—as an engineer, assistant superintendent, superintendent and plant manager in various paper-making operations similar to those conducted at Middletown.

In August of 1983 a compliance officer from OSHA conducted a safety inspection of Smurfit's mill pursuant to § 8(a) of the Occupational Safety & Health Act of 1970, 29 U.S.C. § 651 *et seq.* The compliance officer, whose name is Steven Brunette, has never worked in a paper mill, but the record discloses no reason to suppose that he is not a capable and conscientious compliance officer. At the conclusion of his inspection of the mill, the compliance officer conducted a "closing conference" with the plant manager. The closing conference was less productive than it might have been.

Under date of September 12, 1983, OSHA issued a citation charging Smurfit with fourteen "serious" violations of the OSHA regulations. Penalties totaling almost $7,000 were proposed for the various alleged violations. Smurfit responded with a "Notice of Contest."

In December of 1983 the Secretary of Labor filed a complaint with the Occupational Safety & Health Review Commission, thereby initiating an administrative proceeding in which the Commission was asked to affirm the citation and proposed penalties. Smurfit filed an answer to the complaint, and an Administrative Law Judge conducted a hearing on the matter on April 18, 1984. By the time of the hearing all but two of the charges had been settled by the parties.

The ALJ heard testimony and received documentary evidence on the two charges that remained unsettled. The parties subsequently filed post-hearing briefs, and on October 4, 1984, the ALJ issued a decision and order ruling in favor of Smurfit on one

of the charges and in favor of the agency on the other.

The charge on which the agency prevailed was the first of the fourteen set forth in the citation. It is relatively short, and we quote it in its entirety:

"29 CFR 1910.22(a)(2): Floor(s) of workroom(s) were not maintained, so far as possible, in a dry condition:

(a) At the coater section platform, there was water on the platform causing a slippery condition.

(b) There was a build-up of slime along the lower platform along the backside of the wet end.

(c) At the wet calendar [sic] stack there was a build-up of CMC compound on the backside platform causing a slippery condition."

The charge was prefaced with language indicating that this tripartite violation was alleged to have occurred "on or about the day the inspection was made...."

Subsection (a)(1) of 29 C.F.R. § 1910.22, captioned *"Housekeeping,"* says that "[a]ll places of employment, passageways, storerooms, and service rooms shall be kept clean and orderly and in a sanitary condition." Subsection (a)(2), which Smurfit was charged with having violated, says that:

"The floor of every workroom shall be maintained in a clean and, so far as possible, a dry condition. Where wet processes are used, drainage shall be maintained, and false floors, platforms, mats, or other dry standing places should be provided where practicable."

On the basis of evidence to which we shall turn in a moment, the ALJ found, in a decision and order dated September 14, 1984, that "[f]loors of workrooms at the facility were not maintained in conditions that were as clean and dry as possible." Concluding that Smurfit was thus in violation of 29 CFR § 1910.22(a)(2) at the time of the inspection, the ALJ affirmed the first charge of the citation. He assessed a penalty of $150, rather than the $360 that had been proposed in the citation, possibly taking into account the compliance officer's testimony that there had been no willful or repeated violations.

Smurfit petitioned the Review Commission for discretionary review. No member of the Review Commission directed review within 30 days, so the ALJ's decision and order became a final order of the Commission under 29 U.S.C. § 661(j). Smurfit thereafter filed a timely petition with this court praying that the order be set aside in each of the particulars complained of before the Review Commission.

## II

In the first of its three specifications OSHA pointed to water on the platform at the coater section of the paper machine.

A photograph of the surface of the particular platform in question here was received in evidence as Exhibit 58. The better part of the platform depicted in the photograph appears clean and dry, but there is a relatively small area that appears damp and two areas on which water is visible. The water on one area is deep enough to form a reflecting surface.

Two possible explanations were offered as to how the water came to be on the platform on the day of inspection. The compliance officer testified that a workman told him the company had been having problems with the retraction of the coater (an element of the paper machine adjacent to the platform), "so they were manually pulling the coater hood...." Water was thus able to leak out from the coater hood.

The plant manager offered another possible explanation. He testified that cool water is pumped through the hood to make it "sweat," so the clay-like coating material being applied to the paper will not stick to the stainless steel parts of the machine. The "sweating"—a necessary part of the paper making process—"does cause water to drip down from the hood," the plant manager testified.

Whatever the source of the water on the platform may have been, the compliance officer testified that he did not know how long the water had remained there.

Did Smurfit violate 29 CFR § 1910.-22(a)(2) in suffering the water to remain on the platform at the coater section for an indeterminate period of time? Smurfit's lawyer argued before the ALJ that the question should be answered "no" for the following reason: "That particular section says, 'The floor of every workroom shall be maintained in a clean and so far as possible, a dry condition.' What we are talking about here—it has been testified to by the witnesses—are not floors, they are platforms." The lawyer went on to argue that proper drainage had been maintained, as required by the regulation where wet processes are used, and he noted that Smurfit had complied with the precatory language suggesting that "platforms ... or other dry standing places should be provided where practicable."

Trial counsel for the agency argued that the platform was a "floor;" that it could have been maintained in a "more dry condition;" and that notwithstanding that a wet process was used at the coater section, Smurfit had violated the regulation because the water came from a leak in the coater hood. The leak, he maintained, was "a defect that had not been corrected."

█ The ALJ held that the platform surface should be deemed a "floor" under the circumstances of this case, and he seems to have thought that this conclusion was dispositive of the issue whether there had been a violation.

The latter proposition, we believe, is not sustainable, whether or not the platform rises (or falls) to the dignity of a "floor." If the platform was a floor, Smurfit was only required to keep it dry "so far as possible." The record contains no evidence whatever that Smurfit did not keep it dry "so far as possible." If the water came from a leak that Smurfit was in the process of fixing, we fail to see why Smurfit should be penalized regardless of how long or how short a time the water from the leak had been permitted to remain on the platform and regardless of how quickly Smurfit acted to repair the leak. The agency's trial counsel evidently thought that the mere presence of a leak in the coater hood *ipso facto* established liability, but we do not read the regulation as imposing an absolute duty to prevent leaks at any cost.

The second specification dealt with a "build-up of slime" along a platform on the "wet end" of the paper machine. The platform involved in this part of the charge is depicted in a photograph received in evidence as Exhibit 61. This platform consists of an open grating made up of strips of metal a quarter of an inch wide. The holes in the grating are three and one-half inches long and one inch wide. The source of the slime, according to the Compliance Officer, was "the overspray or [*sic*—should be "of"?] material coming from the stock that's used to make the paper." No slime is visible in the photograph, but the compliance officer testified that it was there; that it presented a slipping and falling hazard; and that the hazard could have been prevented by use of a "serrated edge grating" and more frequent cleaning. The agency's only evidence on frequency of cleaning consisted of testimony by the Compliance Officer that an employee whose name he did not remember and whose job he did not recall told him that Smurfit cleaned the grating about once a month.

Did this testimony establish that Smurfit had violated the regulation as charged in the second specification?

Smurfit's trial counsel argued, again, that the platform was not a "floor", and that Smurfit had provided a platform, as the regulations suggested it should where wet processes were used. Having rejected the argument that the platform was not a floor, the ALJ stated that "[t]he presence of the wet, slimy conditions clearly establishes a failure of compliance with the standard." The ALJ reasoned that "[o]bviously ... cleaning could be performed more often and would produce more safe working conditions," and he found as a factual matter that "[f]loors of the workrooms at the facility were not maintained in conditions that were as clean and dry as possible."

■ One of the problems with this finding—assuming, *arguendo*, that grating attached to a paper machine for use as a platform constitutes "[t]he floor of [a] workroom"—is that Smurfit was not cited for failing to keep the platform *clean.* The only charge levied against Smurfit was that its "floor" was "not maintained, so far as possible, in a *dry* condition." (Emphasis supplied.) We find no evidence in the record, substantial or otherwise, that more frequent washing of the grating would have kept the grating drier.

■ The final specification in the charge against Smurfit is that there was a build-up of a substance called "CMC" on the platform attached to the paper machine at the "wet calendar stack." A photograph of this platform was received in evidence as Exhibit 59. It depicts a painted metal platform with a raised "diamond" tread. The paint has been worn off the raised portions of the diamond pattern on the walking surface, and the diamond tread is clearly visible against the painted background. The photograph, a close-up, shows no water or slime on the walking surface. The photograph also discloses that several small holes have been cut in the platform, presumably for drainage purposes.

The testimony of the compliance officer with regard to this platform was that there was "a build-up of CMC material on the platform creating a slippery condition." The problem could have been alleviated, the compliance officer testified, through more thorough and frequent cleaning and by use of "serrated type gratings available to the general public on the market."

Plant Manager Lewis testified that he had experimented with the use of such a serrated grating over a period of several months and had found that notwithstanding frequent cleanings it made things worse rather than better. The plant manager's uncontradicted testimony established that the continuous ribbon of wet paper that runs through the machine breaks on an average of three times a day. When a break occurs, the wet stock spills over on the platform. It has to be cleaned off—and is cleaned off—after each break. When serrated grating was used, it was found that the teeth of the grating filled up with a papier-mâché-like substance that caused a slippery condition and was very difficult to remove. The diamond pattern surface was much easier to clean; because the raised spots in the diamond pattern did not "grab onto" the paper material, the material could easily be hosed off or pushed off with a heavy broom. "You couldn't remove it with the serrated grating," the testimony showed.

Notwithstanding this clear and compelling testimony, the ALJ found that "cleaning could be performed more often," and "a more serrated floor surface would alleviate the hazardous condition." We find no evidence in the record to support the ALJ's conclusion. Cleaning was performed an average of three times a day, and, the evidence showed, the use of a serrated grating, far from alleviating the hazardous condition, would worsen it.

Because none of the three specifications in the charge is supported by substantial evidence under any interpretation of the regulation, it is unnecessary for us to decide whether the walking surfaces of the paper machine's platforms should be deemed to be "[f]loor(s) of workroom(s)".

### III

We should like to conclude with some *obiter dicta* having nothing to do with our resolution of the issues.

It appears to us doubtful that it should ever have been necessary to bring this case to this court. Without in any way suggesting fault on the part of any individual, we must say that we find it hard to see why this relatively minor housekeeping problem could not have been resolved directly by Plant Manager Lewis and Compliance Officer Brunette, or by the party's lawyers if Lewis and Brunette could not work out a common-sense solution by themselves.

Neither the plant manager nor the compliance officer is a lawyer. Both are practical men with important practical work to

perform, and it must seem passing strange to them, as it would to most people, that a bevy of lawyers and federal judges should have found it appropriate to engage in extensive (and very expensive) lucubrations over the question whether a platform is either a "floor" or a "floor of a workroom." In the world where the plant manager and the compliance officer perform their socially important functions—the world where paper is manufactured, rather than written on—reasonable people do not (or at least should not) allow themselves to become mesmerized by nomenclatorial subtleties. Reasonable people do not have to parse governmental regulations like Philadelphia lawyers to know that walking surfaces should be kept in as non-slippery a condition as is reasonably feasible, and we make bold to suggest that it would have been to everyone's benefit (except possibly the lawyers') for the plant manager and the compliance officer to work out a reasonable understanding on the maintenance of Smurfit's platforms without making a federal case of it.

Smurfit's petition is GRANTED, and the portions of the agency's order of which Smurfit complains are SET ASIDE.

JOHN W. PECK, Senior Circuit Judge, concurring.

I concur on the ground that whether one chooses to call the deck on which the operator stood a "platform" or a "floor", by no reasonable stretch of the imagination can it be called the "[f]loor *of a workroom....*" 29 CFR 1910.22(a)(2). (Emphasis added) It was, rather, a platform composed of heavy expanded metal and was a part of the machine itself. I would dispose of this case, which I agree has consumed far more than its fair share of attention, on that narrow ground.